UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BERNELL JONES, | : | |
| | : | |
| Petitioner, | : | REPORT AND |
| | : | RECOMMENDATION |
| - against - | : | |
| | : | 05 Civ. 7774 (WHP) (RLE) |
| BRIAN FISCHER, | : | |
| | : | |
| Respondent. | : | |

**To the HONORABLE WILLIAM H. PAULEY III U.S.D.J.:**

## I. INTRODUCTION

Petitioner, Bernell Jones ("Jones"), seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction on January 4, 2000, in New York State Supreme Court, New York County. Jones was convicted of robbery in the first and second degrees, and sentenced to two concurrent indeterminate terms of incarceration of twenty-two and twenty years to life, respectively. He is currently incarcerated at the Sing Sing Correctional Facility in Ossining, New York. Jones challenges his conviction on the grounds that he was denied due process because the state's identification procedures – a photographic array, and a corporeal line-up – were, under the totality of the circumstances, unduly suggestive, and resulted in unreliable identifications in violation of the Fourteenth Amendment. He also contends that the witness's identifications were not independently reliable. For the reasons set forth below, I recommend that Jones's writ of habeas corpus be **DENIED** with respect to the photographic array, but **GRANTED** with respect to the line-up.

## II. BACKGROUND

On March 26, 1998, three men robbed Neil Berman ("Berman"), a jewelry manufacturer

and dealer, of approximately $30,000 worth of jewelry on 44th Street and Madison Avenue in

Manhattan.  Memorandum of Law in Opposition to Petitioner's Application for a Writ of Habeas

Corpus ("Opp. Mem.") at 1-2, 6.  Because the encounter was brief, Berman gave generic

descriptions for the three perpetrators – African American men with dark complexions, over

thirty years old, over six feet tall, weighing approximately two hundred to two hundred and thirty

pounds, and with medium builds.  Memorandum in Support of Petition for Writ of Habeas

Corpus Pursuant to 28 U.S.C.  § 2254 ("Jones Mem.") at 2-3; *see* Trial Transcript ("Tr.") at 130-

33, 190-95, 199, and Wade Hearing Transcript ("Wade Hr'g") at 19.  Berman initially told the

911 operator that none of the robbers was  wearing a cap, but did not mention hair style when

giving the description of the perpetrators.  Reply Memorandum in Support of Petition for Writ of

Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Jones Reply Mem.") at 16 (*citing* Tr. at 88;

People's Trial Exhibit 3A).  At trial, he changed his description, and testified that both the man

in front of him and the man to his right were wearing caps.  Tr. at 132-34.

On May 12, 1998, approximately six weeks after the robbery, Berman viewed two

computer generated photographic arrays, one of which contained Jones's picture.  Opp. Mem. at

2.  On June 2, he viewed a corporeal line-up that included Jones.  **Id**. at 3.  Berman identified

Jones in both procedures as one of the men who robbed him.  **Id**. at 4.

Before trial, the court held a **Wade** [**United States v. Wade**, 388 U.S. 218 (1967)]

hearing to determine the admissibility of evidence from the State's identification procedures.

Opp. Mem. at 2.   Jones argued that the array was unduly suggestive because, unlike the other

participants, his picture revealed his build, or body size, and he was not looking directly at the

camera.  Jones Mem. at 5.   He also argued that the line-up was unduly suggestive because none

of the other participants were big, older men – they did not resemble his weight, body size, or

height.  **Id**.  On May 21, 1999, the court denied Jones's suppression motion, finding that neither

identification procedure was unduly suggestive.  Opp. Mem. at 4.  More specifically, the court

found that in both the array and line-up the participants were all African American men with

similar hairstyle and facial hair, and appeared to be of approximately the same age and build, and

differences in height were minimized by having the participants seated.  **Id**. at 4-5.  The court

found that there was nothing distinctive about Jones that would call attention or invite an

identification.  **Id**. at 4.

The jury in the first trial deadlocked after deliberating for over ten hours and sending

three notes to the judge indicating that they were hopelessly deadlocked.  *See* Mistrial

Declaration, October 1, 1999 at 2- 12.  Jones was subsequently retried.  Opp. Mem. at 5.  On

December 7, 1999, a second jury found him guilty of robbery under New York State Penal Law

§§ 160.154(4), 160(1).  **Id**. at 14.

### III. DISCUSSION

**A.     Timeliness**

A petitioner must file an application for a writ of habeas corpus within one year of his

conviction becoming final.  *See* 28 U.S.C. § 2244(d)(1).  A conviction becomes final "when [the]

time to seek direct review in the United States Supreme Court by writ of certiorari expire[s],"

that is, ninety days after the final determination by the state court.  **Williams v. Artuz**, 237 F.3d

147, 150 (2d Cir. 2001) (*quoting* **Ross v. Artuz**, 150 F.3d 97, 98 (2d Cir. 1998).  Because the

New York Court of Appeals denied Jones's application for leave to appeal on June 7, 2004, his

petition had to be filed within one year of September 5, 2004.  The petition was filed on

September 2, 2005, and is therefore timely.

**B.      Exhaustion of Claims**

Pursuant to 28 U.S.C. § 2254(b), as amended by the Antiterrorism and Effective Death

Penalty Act ("AEDPA"), the Court may not consider Jones's petition for habeas corpus unless he

has exhausted all state judicial remedies.  28 U.S.C. § 2254(b)(1)(A); **Picard v. Connor**, 404

U.S. 270, 275 (1971); **Dorsey v. Kelly**, 112 F.3d 50, 52 (2d Cir. 1997).  This requirement of

exhaustion is "based on considerations of comity between federal and state courts, ensuring that

the state courts have an opportunity to consider and correct any violations of their prisoners'

federal constitutional rights."  **Warren v. McClellan**, 942 F. Supp. 168, 170 (S.D.N.Y. 1996)

(*citing* **Picard**, 404 U.S. at 275).  In order to satisfy substantive exhaustion, Jones's claim before

the state courts must have been federal or constitutional in nature.  **Williams v. Taylor**, 529 U.S.

420, 436-437.  Although not an exacting standard, Jones must have informed the state courts of

"both the factual and the legal premises of the claim [he] asserts in federal court."  **Jones v.**

**Vacco**, 126 F.3d 408, 413 (2d Cir. 1997) (*quoting* **Daye v. Attorney General**, 696 F.2d 186,

191 (2d Cir. 1982) (*en banc*)).   He could meet this requirement by:

> (a) reliance on pertinent federal cases employing constitutional
> analysis, (b) reliance on state cases employing constitutional
> analysis in like fact situations, (c) assertion of the claims in terms
> so particular as to call to mind a specific right protected by the
> Constitution, [or] (d) allegation of a pattern of facts that is well
> within the mainstream of constitutional litigation.

**Daye**, 696 F.2d at 194.  Procedurally, Jones must have utilized all avenues of appellate review

within the state court system before proceeding to federal court.  *See* **Bossett v. Walker**, 41 F.3d

825, 828 (2d Cir. 1994).  He must have raised a federal claim at each level of the state court

system, "present[ing] the substance of his federal claims 'to the highest court of the pertinent

state.'" **Id**. (*quoting* **Pesina v. Johnson**, 913 F.2d 53, 54 (2d Cir. 1990)).

Although respondent agrees that the Fourteenth Amendment claim is exhausted, he

argues that the contention that the line-up was rendered further unduly suggestive because Jones

was the only participant wearing light-colored pants was never fairly presented to the state courts

and should be deemed unexhausted.  Opp. Mem. at 17-18.  The Court disagrees.  "The ultimate

question for disposition . . . will be the same despite variations in legal theory or factual

allegations urged in its support."  **Picard**, 404 U.S. at 277.  The Court, therefore, finds that Jones

has sufficiently alerted the state courts of the constitutional nature of his claim.   Jones properly

raised his claim in both his direct appeal to the Appellate Division and his application for leave

to appeal to the New York Court of Appeals.  Respondent's Declaration in Opposition to Petition

for a Writ of Habeas Corpus (" Resp. Decl."), Exh. F.  Since Jones has utilized all avenues of

appellate review and explicitly framed his claims in constitutional terms, those claims are

exhausted and reviewable by this Court.

**C.     Review on the Merits**

Pursuant to 28 U.S.C. § 2254(d), as amended by AEDPA, this Court should grant a writ

of habeas corpus only if one of two conditions is satisfied: the state court adjudication (1)

resulted in a decision that was contrary to clearly established federal law, as determined by the

Supreme Court of the United States, or (2) involved an unreasonable application of clearly

established federal law, as determined by the Supreme Court of the United States.  **Williams v.**

**Taylor**, 529 U.S. 362, 412 (2000); *see also* **Shabazz v. Artuz**, 336 F.3d 154, 160-61 (2d Cir.

2003).  A state court decision is contrary to federal law if the state court applies "a conclusion

opposite to that reached by [the Supreme] Court on a question of law" or if it "decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." **Williams**, 529 U.S. at 413.  A state court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." **Id**.  "Clearly established federal law" refers only to Supreme Court "holdings, as opposed to the dicta, of [its] decisions as of the time of the relevant state-court decision." **Id**. at 412.

An adjudication on the merits occurs when a state court: "(1) disposes of the claims 'on the merits;' and (2) reduces its disposition to judgment." **Sellan v. Kuhlman**, 261 F.3d 303, 312 (2d Cir. 2001) (*quoting* 28 U.S.C. § 2254(d)(1)).  State courts are not required to explain their reasoning process in order to adjudicate on the merits.  **Id**. at 311.  Since Jones's claim was adjudicated on the merits in the appellate court, this Court must review it under the standard of deference set forth in 28 U.S.C. § 2254(d)(1).

Identification procedures that are unnecessarily suggestive and conducive to irreparable misidentification constitute a denial of due process.  **Simmons v. United States**, 390 U.S. 377, 384 (1968).  In determining whether the admission of a pretrial identification procedure violated Jones's due process rights, the Court considers the "totality of the circumstances." **Manson v. Brathwaite**, 432 U.S. 98, 113-14 (1977); **Neil v. Biggers**, 409 U.S. 188, 199-200 (1972).  The Court must determine whether the pretrial identification procedures unduly and unnecessarily suggested that Jones was the perpetrator.  **Raheem v. Kelly**, 257 F.3d 122, 133 (2d Cir. 2001); **United States v. Wong**, 40 F.3d 1347, 1359 (2d Cir. 1994).  If the State's identification procedures were not suggestive, the identification evidence did not violate Jones's due process

rights, and no further inquiry is required because "the reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury." **Raheem**, 257 F.3d at 133 (*quoting* **Foster v. California**, 394 U.S. 440, 442 n.2 (1969)). However, if this Court finds that the State's procedures were unduly suggestive, it must determine whether Berman's identification was independently reliable. **Id**. If there was independent reliability, then the admission of the identification did not violate due process. **Dunnigan v. Keane**, 137 F.3d 117, 128 (2d Cir. 1998).

### 1.      The Photographic Array

"Convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside . . . only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." **Simmons v. United States**, 390 U.S. at 384; *see also* **Jarrett v. Headley**, 802 F.2d 34, 41 (2d Cir. 1986); **United States v. Fernandez**, 456 F.2d 638 (2d Cir. 1972). The danger of misidentification will be increased if the photograph displayed to the witness "is in some way emphasized." **Simmons**, 390 U.S. at 383. Whether an array violates due process depends on "the size of the array, the manner of presentation by the officers, and [its] content." **United States v. Concepcion**, 983 F.2d 369, 377 (2d Cir. 1992). Here, the "principal question is whether [Jones's] picture . . . matching descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that [he] was more likely to be the culprit." **Id**. The Court must consider "each case . . . on its own facts." **Simmons**, 390 U.S. at 384.

Jones argues that the photographic array was unduly suggestive and tainted the subsequent line-up. Jones Mem. at 22. More specifically, he claims that his picture is markedly different from the other photographs in the array because 1) he is the only array participant whose build or body size is clearly revealed in the picture, and 2) he is the only array participant who is not looking directly at the camera in his picture. **Id**. at 22, 25. All other array participants are photographed above the shoulders, and looking directly at the camera. **Id**. at 25. Jones maintains that these differences focus a viewer's attention on his picture and encourages his selection, thus, increasing the likelihood of misidentification and rendering his picture unduly suggestive. **Id**.

Respondent argues that the photograph is not unduly suggestive because the other participants in the array had the same appearance and ethnic background, similar hairstyle, facial hair, and age. Opp. Mem. at 27. He concedes that Jones is not looking directly at the camera because his head is angled downward, but contends that there is nothing distinctive about Jones's photograph that would call attention to it and invite identification. **Id**. at 28. In support of this contention, respondent relies primarily on five cases: **United States v. Marchand**, 564 F.2d 983, 995 (2d Cir. 1977); **United States v. Falange**, 426 F.2d 930, 935 (2d Cir. 1970); **Jamison v. Girdich**, 2005 WL 2338660, at *4-5 (S.D.N.Y. Sept. 26, 2005); **Brown v. Senkowski**, 2004 WL 2979792, at *9-11 (S.D.N.Y. Jan. 21, 2005); and **United States v. Apostolopuos**, 2005 WL 2482525, at *4 (S.D.N.Y. Oct. 6, 2005). **Id**. at 28-30.

These cases discuss various standards to assess whether a photo array is unduly suggestive. In **Marchand**, the court found that over-representation of a defendant in an array does not necessarily make the procedure unduly suggestive. 546 F.2d at 995. The court also

found that it was not unduly suggestive under the totality of the circumstances that the array had two different sized photographs of the defendant.  **Id**.  Unlike a bystander or victim identification, however, this case involved the identification by an accomplice who had known the defendant for years, thus lessening the risk of misidentification.  **Id**. at 996.

The court in **Falange** found that the identification of defendant by a hotel clerk from an array of sixteen photographs containing different pictures of defendant, taken in different years and at different angles, did not violate due process because a handwriting expert identified defendant's signature from a registration card at that hotel.  426 F.2d at 935.

In both **Jamison** and **Brown**, the court found that, under the totality of the circumstances, the arrays were not unduly suggestive even though the defendants in those cases were the only participants with scars.  2005 WL 2338660 at *5; 2004 WL 2979792 at *10.  In **Jamison**, the court found that defendant's facial scar was barely visible and, importantly, noted that because the defendant did not deny shooting the victim but claimed self-defense, the witness identifications were immaterial, if not totally irrelevant to his conviction.  2005 WL 2338660 at *6.  In **Brown,**  the actual photographic array had been misplaced and the habeas court had to accept the trial court findings that the evidence supported the finding that the scar did not "jump out at you" from the photograph.   2004 WL 2979792 at *10.

In **Apostolopuos**, the court acknowledged that "the manner of presentation is a relevant factor," 2005 WL 2482525 at *4, but ruled that an array of six photographs where defendant had his eyes partially closed and occupied the top center position was not unduly suggestive.  The court found that the defendant failed to produce sufficient evidence to show that the identification violated his due process rights.  **Id**.

These cases do not support the contention that differences are not important.  Rather, they highlight the importance of the "totality of the circumstances" standard.  The photographs in question were simply one element in the overall presentation by the prosecution.  In contrast, the identifications here are the centerpiece of the government's case.

While all the photographs in the array in this case appear to be of African American men with similar facial features and hair styles, Jones is the only participant whose picture reveals his body size, or build, and his head is tilted at a different angle.  Jones's photograph is distinct from the others and is suggestive.  However, the Appellate Division affirmed the state court determination that the array was not "unduly suggestive" and concluded that any difference in the appearance Jones's photograph "was not sufficient to create a substantial likelihood that [Jones] would be singled out for identification."  Opp. Mem. at 28.  While Jones is correct that there are suggestive elements in the array, the state court's finding that it was not unduly suggestive is not an "unreasonable application" of the applicable law.  I recommend, therefore, that this claim be **DENIED**.

2.      **The Corporeal Line-up**

Jones argues that the line-up was unduly suggestive because the other participants did not resemble him.  Jones Mem. at 26.  The trial court acknowledged that Jones had the heaviest build, but concluded that he was not so large when compared with the others that undue attention would be focused on him.  Opp. Mem. at 5.  Although "there is no requirement that . . . in line-ups the accused must be surrounded by persons nearly identical in appearance," **United States v. Reid**, 517 F.2d 953, 966, n.15 (2d Cir. 1975), a "reasonable effort to harmonize the line-up is . . . required."  **Douglas v. Portuondo**, 232 F. Supp. 2d 106, 112 (S.D.N.Y. 2002).  "Line-ups in

which suspects are the only participants wearing distinctive clothing or otherwise matching

important elements of the description provided by the victim have been severely criticized as

substantially increasing the dangers of misidentification." **Israel v. Odom**, 521 F.2d 1370, 1374

(7th Cir.1975)**;** *accord* **Blas v. Herbert**, 2003 WL 22480093, *4 (S.D.N.Y. Oct. 31, 2003); *see*

*also* **Solomon v. Smith**, 645 F. 2d 1179, 1183 (2d Cir. 1981) (pretrial identification procedures

found suggestive where an assailant had been described as 5' 7" tall, weighing 145 pounds and

defendant was the only person in the line-up near that description at 5' 6" and weighing 130

pounds– all but one of the other participants being four-to-six inches taller, and the remaining

participant being 65 pounds heavier).  The line-up at issue is "unduly suggestive as to [Jones] if

he meets the description of the perpetrator previously given by the witness, and the other line-up

participants obviously do not." **Raheem**, 257 F.3d at 134.

After the robbery, Berman described the perpetrators in front of him and to his right  in

general terms as African American men with dark complexions, over thirty years old, over six

feet tall, weighing approximately two hundred and thirty pounds, and with medium builds.  Tr. at

130-33, 190-95, 199; Wade Hr'g at 19.  In the line-up photograph, Jones is seated in the third

position.  Resp. Decl., Exh. D.  Jones is thirty-seven years old, 6' 0" tall, and weighs 230 pounds.

Jones Mem. at 4.  The participant in the first position was nineteen years old, 5' 9" tall, and

weighed 190 pounds.  **Id**.  The second participant was forty-two years old, 5' 7", and weighed

170 pounds.  **Id**.  The fourth participant was thirty-three years old, 5'8", and weighed 158 pounds.

**Id**.  The fifth participant was thirty-nine years old, 5'10", and 180 pounds.  **Id**. at 4-5.

What makes the line-up unduly suggestive is not merely that Jones appears different from

the other participants, but that he is the only participant meeting the description of the

perpetrators given by Berman. *See* <u>Raheem</u>, 257 F.3d at 134. The only other relatively "large" man in the line-up is the first participant, and Jones is forty pounds heavier than him. This participant, moreover, is nineteen years old– half Jones's age– and does not appear to be older. The second participant is closer in age at 42, but is only 5'7" and slight in build at 170 pounds– 60 pounds lighter than Jones. The fourth participant is over thirty years old, but even smaller than the second participant, as he weighs only 158 pounds – 72 pounds lighter than Jones. The fifth participant, although closer to Jones's age and height, weighs fifty pounds less, looks slight in build, and has a lighter complexion. Jones is clearly the "big" man in this group, and he is in the center of the line-up, positioned between the two smallest participants.[1] The differences in age, weight and complexion are exacerbated by Jones's distinctive clothing. Not only is he the only participant wearing light pants, he is also the only participant wearing a wool, oversized hat that covers his dreadlocks. All other participants are dressed in dark-colored pants, and each is wearing what appear to be identical black baseball caps. The difference in appearance between the line-up participants and Jones, who is wearing distinctive clothing, is unnecessarily suggestive and conducive to irreparable misidentification. *See* <u>Simmons</u>, 390 U.S. at 384. In order to satisfy due process, the identification must, therefore, be "independently reliable." <u>Raheem</u>, 257 F. 3d. at 135 (*citing* <u>Manson v. Braithwithe</u>, 432 U.S. 98, 114).

### 3.       Berman's Identification Is Not an Independently Reliable Source

Respondent argues that, even if the photographic array and corporeal line-up are found to be unduly suggestive, the Court should find Berman's identification to be admissible because it

---

[1] Although Jones maintains that there are differences in height in the line-up, the police ameliorated the differences in height by seating all the participants. <u>Puckett v. Senkowski</u>, 2004 WL 840295, *5 (S.D.N.Y. Apr. 19, 2004).

was independently reliable.  *See* **Neil v. Biggers**, 409 U.S. 188, 199-200 (1972).  Here, "[t]he

central question is whether under the totality of the circumstances the identification was reliable

even though the confrontation procedure was suggestive."  **Id**.  In determining independent

reliability, the court considers "[1] the opportunity of the witness to view the criminal at the time

of the crime, [2] the witness's degree of attention, [3] the accuracy of the witness's prior

description of the criminal, [4] the level of certainty demonstrated by the witness at the

confrontation, and [5] the length of time between the crime and the confrontation."  **Biggers**, 409

U.S. at 199-200; **Bouchereau v. Greiner**, 2002 WL 1379108, at *5 (E.D.N.Y. Jun. 21, 2002).

Applying the factors set forth in **Biggers**, there is no clear independent reliability of

Berman's identification.  While Berman did have an opportunity to view the perpetrators at the

time of the crime, the entire interaction was brief.  He testified that he was unable to remember

which of the three men threatened to shoot him because "[t]he whole thing didn't take very

long."  Tr. at 76-77.  *See* **Dickinson v. Fogg**, 692 F. 2d 238, 245 (2d Cir. 1982) (staring at

perpetrator's face for one or two minutes "fails to lend support to a determination of reliability").

Berman also testified that the event lasted "a couple of minutes" that "seemed like forever."  **Id**.

at 75.  While the Court must except this testimony as true, it is likely that such a street encounter

did not actually last "minutes."  Further, it is not clear which of the three perpetrators Berman is

identifying in the line-up.  There is contradictory evidence as to where the various perpetrators

were standing in relation to Berman.  Detective Meehan ("Meehan"), the officer who conducted

the line-up, testified that Berman signed a line-up form immediately after the identification.  Tr.

at 219-21.  Meehan had no independent recollection of what Berman said on that day, but

testified that the official police report which summarized the result of the line-up, indicated that

Berman identified Jones as the robber to the right of him. **Id**. at 267-68

Berman testified at trial, however, that Jones was the man directly in front of him. **Id**.  In

its attempt to explain the inconsistencies in Berman's testimony and the line-up report, the

Government argues that "Det. Meehan admitted on cross that he had made a typo on his DD-5

[investigative report form] after the lineup." Opp. Mem. at 42, n. 17.  The Government further

states that Meehan "admitted that he must have split up the actions of 'perp two' into two

different people, 'perp one' and 'perp two', when his handwritten notes showed that it was just

one person, 'perp two.'" **Id**.  However, this explanation does not relate to Berman's identification

of Jones during the line-up.  It concerns Meehan's interview of Berman on March 26, 1998.  The

alleged clerical error occurred when he typed the robbery complaint form from his notes the day

after interviewing Berman.  Tr. at  247-53.   The line-up occurred on June 2, 1998, more than two

months later.  **Id**. at 259.   More importantly, Meehan testified that he was an experienced officer.

**Id**. at 216.  He certainly knew the need for accuracy in the identification.  The argument that he

did not accurately reflect what Berman said at the line-up is questionable.  It therefore remains

unclear which perpetrator Berman is identifying in the line-up.  Not only does this contradiction

discredit the reliability of the identification as to the first factor (the opportunity to view the

perpetrator), it calls into question other factors, such as the Berman's degree of attention, the

accuracy of the prior description, and the level of his certainty.

With regard to the second **Biggers** factor, the witness's degree of attention, Berman

testified that the robber to his right had a gun pressed into his ribs, Opp. Mem. at 42, and that

Jones was the perpetrator facing him.  Although he maintained that he focused his attention on

the perpetrator in front, Opp Mem. at 43, his attention would have been distracted by the robber

sticking a gun in his right side.  *See* **Raheem**, 257 F. 3d at 138 (court finding that witnesses are more likely to look at the gun than at the face of the person pointing it at them).

On the third factor, the State contends that "Berman had recalled every part of [Jones's] face, because he was looking primarily at [Jones's] eyes."  Opp. Mem. at 11.  However, Berman's description to the police did not mention the face, and included characteristics only about the body – height, weight, build and clothing – and did not distinguish among the robbers. He failed to describe the perpetrators' hair or facial hair, yet he testified to being able to remember every portion of Jones's face.  Opp. Mem. at 46.  These circumstances present problems for respondent's position.  Jones had a distinctive graying beard and wore his hair in dreadlocks.  If Berman were focused on the perpetrator's face, he would have noticed, and noted, this in the description of the perpetrator.  Yet, he expressly told the 911 operator that the three robbers were not wearing caps, Jones Reply Mem. at 16 (*citing* Tr. at 88; People's Exhibit 3A), but "blue like ski masks."  Opp. Mem. at 8.  While at trial, Berman testified that Jones was wearing a cap that covered his face down to his eyebrows.  Respondent surmises that this could conceivably explain why he had not described Jones's hair.  **Id**. at 9.  The existence of a cap though presents other issues.  First, even if the presence of a cap might have some impact on the failure to notice distinctive hair, it does not explain the failure to note or describe the beard. Second, Berman's testimony does not make clear whether the cap was in lieu of, or in addition to, the ski mask reported to the 911 operator.  But if Jones's head was covered with a cap "down to his eyebrows" and his beard was covered, what then was the identification based on?  When respondent asserts that Berman recalled "every part of [Jones's] face," he does not indicate which parts Berman could have observed.  Nowhere in the record is this made clear.  Because Jones had

a graying beard and two-foot dreadlocks at the time of the crime, Jones Mem. at 19 (*citing* Tr. at

300), the failure to note these characteristics in a robber whose face and head were not covered,

would substantially undermine the identification.  On the other hand, if the hair and beard were

covered, what characteristics of Jones's face served to support the identification?  *See* <u>Raheem</u>,

257 F. 3d at 138- 40 (witness's "inability to describe any features of the shooter's face" militated

against a finding of independent reliability).

As to Berman's level of certainty (factor four), he testified that he had "no doubt at all"

that Jones was the robber who was "directly in front of [him]" and that he was certain of Jones's

face.  Opp. Mem. at 11, 46 (*quoting* Berman's trial testimony at 73, 75, 95-96, 100).  However,

the discrepancies in Berman's identification concerning whether Jones was the perpetrator facing

him or on his right holding the gun, and the change between a ski mask and a cap, call into

question the level of certainty he testified to having at trial.

The final factor evaluates the length of time between the crime and the confrontation

because "immediacy makes it much more likely that the witness will have a fresh recollection of

the appearance of the suspect and hence that the identification will be accurate."  <u>Dickinson</u>, 692

F. 2d at 247 (citations omitted).  The robbery took place March 26, 1998, and the line-up

occurred approximately nine weeks later on June 2, 1998.  Opp. Mem. at 1-2.  This nine-week

gap fails to contribute to the independent reliability and is not outweighed by any of the other

factors.  *See* <u>Dickinson</u>, 692 F.2d at 247 (forty-hour gap between the crime and confrontation

may not have greatly decreased witness's recall facilities, but it did not contribute to a finding of

independent reliability for the identification); *cf.* <u>Wong</u>, 40 F.3d at 1360 (ten-month gap

outweighed by opportunity to observe perpetrator, high degree of attention, and defendant's

"striking resemblance" to sketch of assailant created less than ten days after incident).

Additionally, the prosecution's case rested heavily on Berman's testimony.  *See* Jones

Mem. at 28.  Berman's lack of credibility also contributes little to the reliability of his

identification.  At trial, the prosecution described Berman as having a "checkered past" who had

been convicted in state and federal court of conspiracy and a "scheme to defraud."[2]  Tr. at 17-19,

102.  His reliability is questionable.

Under the totality of the circumstances test, none of the **Biggers** factors, nor Berman's

credibility, establish independent reliability for his identification.  Therefore, because the line-up

was suggestive and the identification lacked independent reliability, admission of the

identification at trial was an unreasonable application of clearly established federal law as

determined by the Supreme Court, because the identification procedures were unnecessarily

suggestive and conducive to irreparable misidentification.  **Simmons**, 390 U.S. at 384.  This was

a denial of due process.   Therefore, I recommend that Jones's line-up claim be **GRANTED**.

### IV. CONCLUSION

For the reasons set forth below, I recommend that Jones's writ of habeas corpus be

**DENIED** with respect to the photographic array, but **GRANTED** with respect to the line-up**.**

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have ten (10) days after

being served with a copy of the recommended disposition to file written objections to this Report

and Recommendation.  Such objections shall be filed with the Clerk of the Court and served on

all adversaries, with extra copies delivered to the chambers of the Honorable William H. Pauley,

---

[2]Berman pled guilty in federal court to a Scheme to Defraud the Government in 1993, and was sentenced to five years probation, and was required to pay a $5,000 fine and $26,000 in restitution.  Opp. Mem. at 5, n. 5.  In 1996, he pled guilty in state court to charges stemming from the same incident.  **Id**.

III, 500 Pearl Street, Room 2210, and to the chambers of the undersigned, Room 1970.  Failure to

file timely objections shall constitute a waiver of those objections both in the District Court and

on later appeal to the United States Court of Appeals.  *See* **Thomas v. Arn**, 474 U.S. 140, 150

(1985); **Small v. Secretary of Health and Human Services**, 892 F.2d 15, 16 (2d Cir. 1989) (*per*

*curiam*); 28 U.S.C. § 636(b)(1) (West Supp. 1995); Fed. R. Civ. P. 72, 6(a), 6(e).


**DATED: April 12, 2007**
**New York, New York**

**Respectfully Submitted,**

The Honorable Ronald L. Ellis
United States Magistrate Judge

**Copies of this Report and Recommendation were sent to:**

Mitchell J. Briskey
Legal Aid Society
Criminal Appeals Bureau
199 Water Street, 5th Floor
New York, NY 10038

Alyson J. Gill
Assistant Attorney General
Office of the Attorney General of New York
120 Broadway, 22nd Floor
New York, NY 10271

18